UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ANTHONY FOX,

                                    Plaintiff,

            vs.

                                                        9:05-CV-1292
WILLIAM BROWN, Superintendent,                          (J. Suddaby)
Eastern Correctional Facility; et al.
                                    Defendants.

_____

ANTHONY FOX, Plaintiff *Pro Se*
GERALD J. ROCK, Assistant Attorney General

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and Local Rules N.D.N.Y. 72.3(c).

        In this civil rights complaint[1], plaintiff alleges that Dr. Bhavsar and Dr.

Milicevic were deliberately indifferent to plaintiff's serious medical need for care of a

painful and persistent skin condition.  In addition, plaintiff alleges that Dr. Milicevic

and Sergeant Lucas conspired together to deny plaintiff medical care for his skin

_____

        [1]The court mentions only plaintiff's remaining claims.  Defendants previously made a
motion to dismiss under FED. R. CIV. P. 12(b)(6). (Dkt. No. 11).  Senior United States District
Judge Lawrence E. Kahn adopted (Dkt. No. 23) a Report-Recommendation (Dkt. No. 21) by this
court, and dismissed several other claims against defendants Eastern Correctional Facility
Superintendent Brown, Dr. Gusman, and Grievance Director Thomas Eagen.  Drs. Milicevic and
Bhavsar, and Sergeant Lucas are the only remaining defendants.

condition, and to deny him a "bottom bunk pass" that would allow plaintiff to utilize the bottom bunk.  Plaintiff also alleges that Sergeant Lucas retaliated against plaintiff for filing grievances by arranging plaintiff's transfer to a more restrictive correctional facility.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 46).  Plaintiff opposes defendants' motion, and has filed a cross-motion for summary judgment. (Dkt. No. 52).  Plaintiff's cross-motion also contains a request for sanctions against defense counsel for failure to comply with a discovery order of this court.  *Id*.  Defendants have filed a Memorandum of Law in opposition to plaintiff's cross-motion, and plaintiff has filed a reply.  (Dkt. Nos. 53, 54).  Plaintiff seeks substantial monetary relief in the form of compensatory and punitive damages.  (Compl. at 11).

This court recommends that defendants' motion for summary judgment be ***granted*** and that plaintiff's cross motion be ***denied***.

## DISCUSSION

## 1.    <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the

party opposing the summary judgment motion." *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Id*.  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**2.**   **Facts**

Plaintiff is currently incarcerated at Gouverneur Correctional Facility in Gouverneur, New York.  Plaintiff's claims arose during the two months when he was incarcerated at Eastern Correctional Facility ("Eastern") in the summer of 2005.  Plaintiff was transferred to Eastern from Coxsackie Correctional Facility on June 15, 2005.  (Dkt. No. 46, Lucas Affidavit, Ex. A).  On August 23, 2005, plaintiff was transferred from Eastern to Five Points Correctional Facility ("Five Points").  *Id*.

**A.  *Medical Treatment***

Upon plaintiff's transfer to Eastern, New York State Department of

3

Correctional Services ("DOCS") staff completed several forms on June 17, 2005 related to plaintiff's physical condition.  Plaintiff's medical records include a form titled "Health Screening for Intrasystem Transfer" signed on June 17, 2005.  (Dkt. No. 46, Milicevic Declaration, Ex. A at 1-2).  The form asked a series of questions including, "Are there any lesions or rashes?"  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 1).  The individual who completed the form marked an "x" in the "no" box, and left blank the comments section next to that question.  *Id*.

Plaintiff signed several forms on June 17, 2005.  The first form, a "Medical Department Procedure Form," explained the sick call procedures, and indicated that plaintiff had been seen for "new draft screening."  *Id*. at 25.  Plaintiff signed a second form on June 17, 2005, "Health Services Orientation," that detailed the policies for health services.  *Id*. at 24.  Plaintiff also signed a "Screening and Physical Assessment for Placement in a Double-Cell" form.  *Id*. at 23.  The screener marked "no" in response to a question about "known medical indications requiring [plaintiff] to be placed in a bottom bunk bed."  *Id*.  The screener also marked "no" in the Physical Assessment portion of the form that asked about "skin rashes, jaundice or lesions that could indicate an acutely communicable illness."  *Id*.

Approximately one week after entering Eastern, on June 24, 2005, the Ambulatory Health Record ("AHR") shows that Dr. Bhavsar examined plaintiff.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 16).  Plaintiff had complained of seasonal allergies,

and Dr. Bhavsar prescribed Flonase, a nasal spray.  *Id*.  Dr. Bhavsar also examined a

cyst on plaintiff's buttock and recommended that the cyst be evaluated again after

three months.  *Id*.  Dr. Bhavsar wrote

> I/M requesting low bunk bed and started to c/o other medical problems.  I
> said you [illegible word] these problems make other medical sick call.  Pt
> got aggitated [sic] & I called officer on duty & Pt left office.

*Id*.

On June 27, 2005, plaintiff submitted a hand-written document

he titled "Sick Call Request."  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 13).  Plaintiff

listed five items under the heading "Description of problem."  *Id*.  Plaintiff wrote:

> 1.  High Blood pressure (Dizziness and faintness), P was previously
> diagnosed but received no treatment - P would like to be seen by the
> doctor in regards to being placed on a "Diet"
>
> 2.  Bottom Bunk/Flats pass (I recently had Bunion surgery on both feet
> also I have a torn muscle in my right thigh that has calcified and is very
> painful) prior to being transfered [sic] to Eastern I had a "Bottom
> Bunk/Flats" pass placed in my medical file.
>
> 3.  I have a case of athlete's feet [sic]
>
> 4.  Skin rash and Infection from insect bites
>
> 5.  Medication refill (RX # 421753)

*Id*.

On June 27, 2005, Dr. Milicevic conducted a "chart review" of plaintiff's

medical records.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 15).  Dr. Milicevic wrote that

plaintiff had bunion surgeries "last year," and that plaintiff had physical therapy for his big toe on his left foot.  *Id*.  Dr. Milicevic also noted that plaintiff possessed "special orthotics in boots."  *Id*.  Dr. Milicevic concluded that there was "No medical need for bottom bunk," and that there was no "indication now for bottom bunk–has well healed by now."  *Id*.  Two days later, on June 29, 2005, a nurse wrote "reg. bottom bunk - had same @ previous facility R/T bc lat foot surgeries."  *Id*.  The court interprets this statement to mean that plaintiff requested a bottom bunk, and previously had been assigned to a bottom bunk because of plaintiff's foot surgeries.  The next day, another nurse wrote "wants bottom bunk denied by MD 6/27" and "c/o pain [in right] thigh request OTC."  *Id*. at 14.

Three days after the first hand-written "Sick Call Request," plaintiff submitted a second request on June 30, 2005.  This request was also handwritten, with a list of four items in the "Description of problem" section.  Plaintiff wrote:

1.  Bottom bunk/Flats pass (not received per 6/27/05 sick call visit).

2.  Athlete's Feet [sic]

3.  Medication refills were never received

4.  Torn muscle in right thigh (calcified and a constant source of pain)

In an undated entry in July 2005, plaintiff complained of "Pain.  elements of skin itching."  *Id*.  Plaintiff was prescribed Elimite and Benadryl, and the medical professional wrote "24 hours admit."  *Id*.

6

On July 13, 2005, Dr. Milicevic examined plaintiff in person for the first time, and wrote that, subjectively, plaintiff had pain in his right thigh.  *Id*.at 11.  She also wrote "bottom bunk."  *Id*.  Dr. Milicevic's July 13, 2005 entry takes up a full page and a portion of a second page of the AHR, and includes several notations about the history of plaintiff's bunion surgery and the injury to his right thigh.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 11, 8).  Dr. Milicevic wrote that plaintiff "c/o tore muscle in R thigh ? 6-7 yrs ago playing softball.  Didn't swell or bother him till 2-3 months later. initially like muscle strain."  *Id*.  Dr. Milicevic then recorded that plaintiff had surgeries on his right foot in January 2004, and on a bunion on his left foot in June 2004.  *Id*.  Dr. Milicevic wrote that petitioner had "pt" or physical therapy after his surgery on his right foot, and that plaintiff had "extra depth ortho boots" ordered in April 2004.  She made a note to follow up on the prescription footwear because the "custom made cusions were made, but [plaintiff] said he was never given the footwear."  *Id*.  Dr. Milicevic found an "organized area of thrombophlebitis," and ordered x-rays.  (Dkt. No. 46, Milicevic Dec'l, ¶¶ 10-12 and Ex. A at 11and 20).

In her declaration, Dr. Milicevic states that the x-rays "came back normal." (Dkt. No. 46, Milicevic Dec'l, ¶ 12).  The X-Ray Requisition and Report form states that the results of the x-ray show "no fracture or other osseous abnormality.  No arthritic changes seen of hip joint.  No calcified soft tissue mass seen."  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 20).  The bottom third of the full page of Dr. Milicevic's

notes regarding the July 13, 2005 entry is largely illegible.

On the second page of the AHR for July 13, 2005, Dr. Milicevic drew an arrow pointing to the words "sick call re rash/bites." *Id*. at 8. In the same entry, Dr. Milicevic also wrote "No medical indicator for bottom bunk." *Id*. The court notes that in her Declaration, Dr. Milicevic stated that plaintiff "did not complaint [sic] to me of a skin rash on July 13th and I do not recall there being any evidence of a skin rash on that date." (Dkt. No. 46, Milicevic Dec'l, ¶ 13).

On July 24, 2005, plaintiff handwrote a third "Sick Call Request" listing two items in the "Description of Problem" section. Plaintiff wrote

1. Abcess [sic] on back of neck, large and painful

2. Continued skin irration [sic], itching and rash from insect bites

(Dkt. No. 46, Milicevic Dec'l, Ex. A at 10). Plaintiff attended sick call on July 25, 2005. (Dkt. No. 46, Milicevic Dec'l, Ex. A at 8). A medical provider recorded that plaintiff complained of an "ingrown hair" on the nape of his neck. *Id*.

On July 27, 2005, plaintiff handwrote a ***fourth*** "Sick Call Request" that listed only one item: "dry, itchy and painful skin rash. I have been experiencing this problem over [one and one half] months." *Id*. at 9. Dr. Bhavsar examined plaintiff the same day, July 27, 2005. *Id*. Dr. Bhavsar found that plaintiff had a boil on the nape of his neck. *Id*. Dr. Bhavsar wrote that the boil was dry, and that a scab was present with no discharge. *Id*. Dr. Bhavsar instructed plaintiff to use warm compresses. *Id*.

(*See also* Dkt. No. 46, Bhavsar Affidavit, ¶ 12).

In an undated entry that occurred in July 2005 after Dr. Bhavsar's July 27, 2005 entry, a medical provider stated that plaintiff complained of "chronic rash on both arms for 1-2 months.  Per AHR 4/27/05 appears to be insect bites mixed [with] folliculitis."  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 7).  The provider ordered Lidex ointment and "Cleocin T gel".  *Id*.  Plaintiff was eventually admitted to the infirmary for twenty-four hours after a diagnosis of scabies, and was given Elimite.  *Id*.  Plaintiff's clothes and bedding were changed.  *Id*.  The notes from plaintiff's admission show that before plaintiff was discharged to the general population, a medical professional wrote, "No complaints.  No itching[,]" in an entry dated July 29, 2005.

AHR entries on August 3 and 4, 2005 show that plaintiff continued to complain about the rash on his arms.  *Id*. at 6.  On August 3, 2005, plaintiff was prescribed Benadryl.  *Id*.  In another undated entry that seems to have been written between August 4, 2005 and August 20, 2005, the medical provider noted "mild furuncles of both hands chest needs treatment" [sic].  *Id*. at 5.  Plaintiff was prescribed Lidex cream, Benzoyl peroxide, doxycylcine, and Teldrin.  *Id*.  On August 20, 2005, plaintiff was again prescribed the same four medications, as well as Benadryl.  *Id*.

### B.  Double-Cell Assignment

As noted above, plaintiff was subject to a "Screening and Physical Assessment

9

for Placement in a Double-Cell" on June 17, 2005.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 23).  Plaintiff was assigned to share a cell with another inmate when plaintiff was transferred to Eastern.  (Dkt. No. 46, Lucas Affidavit, ¶ 9).

On August 1, 2005, plaintiff was presented with a form related to his double-cell assignment that gave plaintiff three options.  (Dkt. No. 46, Lucas Affidavit, Ex. E).  The form stated that after 45 days in a double cell, an inmate could select one of the three options by signing and dating the form under his or her choice.  *Id*.  The options were (1) to remain in a double-cell until his or her name was reached on the Double Cell Seniority List, or (2) to remain in a double-cell unit until his or her name was reached on the Double Cell Seniority List ***and*** a single cell became available in his or her current cell block, or (3) not to remain in a double-cell unit at Eastern beyond 60 days, and his or her name would be submitted for transfer to any facility than could accommodate the inmate in a single cell.  *Id*.  The form shows that plaintiff selected the third option.

The defendants' papers include an affidavit by defendant Sergeant Lucas. Sergeant Lucas states that his duties were to manage inmate housing issues at Eastern. (Dkt. No. 46, Lucas Affidavit, ¶ 3).  He states that plaintiff's signed form was given to plaintiff's corrections counselor for submission of a transfer request.  *Id.* at ¶ 15 Sergeant Lucas states that he did not have any role in the submission of plaintiff's transfer request.  (Dkt. No. 46, Lucas Affidavit, ¶ 15).  Sergeant Lucas also states that

10

DOCS's Office of Classification and Movement headquartered in Albany, New York "makes the actual determination as to where a particular inmate will be transferred and I have no role in that decision." *Id*.

Plaintiff was transferred to Five Points Correctional Facility in Romulus, New York in August 2005. (Dkt. No. 46, Lucas Affidavit, Ex. A). According to DOCS Directive 0024, "[h]ousing units at Five Points Correctional Facility consist of double cells." (DOCS Directive 0024, included at Dkt. No. 52, Affidavit, Ex. D-5). Plaintiff states that Five Points is a "higher security facility." (Dkt. No. 52, Memo. at 8). Plaintiff states that "it is also undisputed that the plaintiff remained at (Five Points) for approximately 11 months and 3 weeks, and was forced to 'double cell' 9 months beyond the 60 days allowed by (Directive 4003, § 1701.07)." (Dkt. No. 52, Statement of Material Facts, ¶ 7). Plaintiff states that he was assigned to a single cell at Eastern before his transfer to Five Points. *Id*. at ¶ 9.

### C.  *Grievances*

Karen Bellamy, the Director of the Inmate Grievance Program for DOCS, submitted an affidavit in support of defendants' motion for summary judgment. (Dkt. No. 46, Bellamy Affidavit). Attached to Ms. Bellamy's affidavit is a complete list of grievances filed by plaintiff between July 24, 2003 and October 18, 2007. (Dkt. No. 46, Bellamy Affidavit, Ex. A). The list shows that plaintiff filed only two grievances during his two months at Eastern. *Id*. The grievances were filed on July 1, 2005 and

11

August 2, 2005. *Id*. Prior to his arrival at Eastern, plaintiff filed five grievances in 2003 and 2004 at a correctional facility abbreviated "SS". *Id*.

### D. Discovery Issue

In his cross-motion for summary judgment, plaintiff also makes a request for sanctions against defense counsel. (Dkt. No. 52, *Memorandum of Law* ("Memo.") at 11-13). Plaintiff alleges that defendants failed to comply with this court's order directing defendants to provide plaintiff with telephone records for July 13-15, 2005. (Dkt. No. 48). Plaintiff's position is that the requested telephone records could show that a telephone call between Sergeant Lucas and Dr. Milicevic took place, supporting his claim that the two conspired to deny plaintiff medical treatment and a bottom bunk pass. (Compl. at 4-5; Dkt. No. 44). The order directed that the telephone records be provided within thirty days of the order. (Dkt. No. 48). Plaintiff's cross-motion for summary judgment and motion for sanctions were filed on July 8, 2008. (Dkt. No. 52).

On May 29, 2008, the court received a letter motion from defense counsel requesting an extension of time to comply with this court's May 6, 2008 order. (Dkt. No. 49). On May 30, 2008, the court granted defense counsel's request, and ordered a thirty day extension of time to comply with the May 6, 2008 order. (Dkt. No. 50). The court also extended plaintiff's time to respond to defendants' motion for summary judgment to July 11, 2008. (Dkt. No. 51).

12

When plaintiff filed his cross-motion on July 8, 2008, he had not yet received the telephone records that had been the subject of his motion to compel. (Dkt. No. 52, Memo at 12-13). Defense counsel responded to plaintiff's motion for sanctions, and included documents related to the production of the requested telephone records. (Dkt. No. 53, Declaration Exhibits). The documents include a Declaration of Service that reflect that the telephone records were mailed to plaintiff on July 3, 2008. *Id*. Plaintiff has filed a reply to defendants' responding Memorandum of Law. (Dkt. No. 54). Plaintiff argues that defendants' production of the requested telephone records is insufficient because the telephone records "fails to contain any 'identification' attached to the phone records to verify who the records 'factually' belong to." (Dkt. No. 54, Memo. at 6-7). The court notes that the telephone records only list extensions, and the dates and times that calls were made to and from one extension at Eastern. (Dkt. No. 53, Rock Declaration, Exhibits 5-8). The telephone records do not include information about what departments or individuals are assigned to which extensions. *Id*.

## 3.   **Medical Care**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate

13

indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted).  Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious."  *Id.* (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care.  *Id.* (citing *Estelle*, 429 U.S. at 105-106).  Instead, plaintiff must show that the defendants were

"deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds*, 151 F. Supp. 2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement

15

with treatment are not actionable under Section 1983.

In this case, plaintiff's claim about the bottom bunk pass is somewhat unclear. Plaintiff requested to be assigned to a bottom bunk.  As a basis for his request, plaintiff relied on the fact that he had surgeries on both feet in 2004, as well as his complaint of pain in his right thigh.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 13). Plaintiff stated that he "had a 'bottom bunk/flats' pass placed in [his] medical file." *Id*.

Plaintiff does not allege that he asked for and was refused medical treatment for his feet during his incarceration at Eastern.  Plaintiff did not request physical therapy, pain medication, or any other medical care with respect to his previous surgeries on his feet.  Plaintiff requested "OTC" ***only once*** on June 30, 2005, which the court reads as a request for over-the-counter pain medication specifically for his ***right thigh***. (Dkt. No. 46, Milicevic Dec'l, Ex. A at 14).  The only "treatment" that plaintiff requested with respect to his feet was amelioration of his athlete's foot condition, and the bottom bunk pass.  Without any other complaint about or request for treatment of his feet, plaintiff has not shown a medical need of the emergent or degenerative nature required to show a ***serious*** medical need.

Furthermore, Dr. Milicevic cannot be said to have been deliberately indifferent to any presumed medical need with respect to plaintiff's request for a bottom bunk pass.  Dr. Milicevic conducted a review of plaintiff's chart on June 27, 2005, the same

day that plaintiff submitted his first handwritten "Sick Call Request."  (Dkt. No. 46,

Milicevic Dec'l, Ex. A at 15).  Upon plaintiff's further and repeated requests for the

bottom bunk pass, Dr. Milicevic examined plaintiff on July 13, 2005.  (Dkt. No. 46,

Milicevic Dec'l, Ex. A at 11, 8).  It does not appear that Dr. Milicevic ignored

plaintiff's requests or refused to treat him in this regard.  Plaintiff's disagreement with

Dr. Milicevic's medical judgment and her denials of plaintiff's request for a bottom

bunk pass does not show that defendant Milicevic was deliberately indifferent to

plaintiff's serious medical need.

Plaintiff claims that both Dr. Milicevic and Dr. Bhavsar were deliberately

indifferent to his serious medical need regarding a persistent skin rash.  Dr. Bhavsar

examined plaintiff only twice during plaintiff's stay at Eastern.  The first examination,

on June 24, 2005, was performed after a notation of "seasonal allergies" on plaintiff's

AHR.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 16).  Dr. Bhavsar prescribed Flonase

for the allergies, and also examined a cyst on plaintiff's buttock.  *Id*.  The appointment

degenerated when plaintiff attempted to raise other medical issues, outside the scope

of his original appointment.  *Id*.  Dr. Bhavsar instructed plaintiff to make another

request for sick call so that these other issues could be addressed.  *Id*.  Plaintiff was

eventually escorted out of the office.  *Id*.  Plaintiff states that one of the issues that he

17

tried to raise[2] with Dr. Bhavsar was his skin rash.  (Compl. at 4).  Plaintiff states that at the time of his examination by Dr. Bhavsar, plaintiff had "open sores" on his arms. *Id*.

The court notes that it was during plaintiff's June 24, 2005 examination related to his seasonal allergies that plaintiff ***first*** raised his complaint about his skin rash to Dr. Bhavsar, and Dr. Bhavsar told plaintiff that he needed to make another sick call request.  Plaintiff's first handwritten "Sick Call Request" is dated some ***three days after*** the June 24, 2005 appointment. (Dkt. No. 46, Milicevic Dec'l, Ex. A at 13). Plaintiff ***waited three days*** to express any further concern about his skin rash. Plaintiff's own delay in requesting another appointment appears to indicate that his skin rash was not of the emergent nature required to show a serious medical need.  In fact, when he finally did complain of his skin rash, he wrote only "skin rash and infection from insect bites."  *Id*.

Plaintiff's concern about his skin rash was not listed at all in his next handwritten list of concerns in another "Sick Call Request," dated June 30, 2005, ***three days after his first handwritten request***.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at

---

[2]In his complaint, plaintiff states that he was examined by Dr. Bhavsar on July 9, 2005. (Compl. at 4).  Plaintiff states that he was examined by Dr. Bhavsar on two occasions, July 8 and 27, 2005.  (Comp. at 6).   The AHR does not reflect that Dr. Bhavsar examined plaintiff on July 8 or 9, 2005.  Since plaintiff acknowledges that there were only two visits, it appears that plaintiff is simply mistaken about the date of the first visit, and that the first visit occurred on June 24, 2005.

12). Plaintiff may have experienced some itching, but even his own complaints reflect that plaintiff's skin rash was not of an emergent or degenerative nature.

Though plaintiff states to the court that he had "open sores," the most serious complaint he made directly to a medical provider was "pain. elements of skin itching". This complaint is reflected in an undated AHR entry in July 2005 that appears to have been made between July 8 and July 13, 2005.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 14).  Plaintiff's third and fourth handwritten "Sick Call Requests" on July 24 and 27, 2005 contain complaints about the skin rash: "continued skin irritation, itching and rash from insect bites" and "dry, itchy and painful skin rash." (Dkt. No. 46, Milicevic Dec'l, Ex. A at 10, 9).

At his second appointment with Dr. Bhavsar on July 27, 2005, the records do not show that plaintiff complained about his skin rash.  His only complaint on that occasion concerned the "boil on [the] nape of [his] neck."  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 8).  It does not appear that plaintiff even raised the issue of his skin rash at the July 27 appointment with Dr. Bhavsar.

Plaintiff received a variety of treatments for his skin condition while he was incarcerated at Eastern.  His prescriptions included Benadryl and hydrocortisone cream.  Furthermore, although Dr. Bhavsar apparently ran out of time at his first appointment with plaintiff, the record shows that he instructed plaintiff to follow up with another sick call request.  Plaintiff did so ***three days later***.  At their second

appointment, Dr. Bhavsar treated the medical issue that plaintiff raised.  Plaintiff's

frequent treatment, and his own delays in asking for care for his skin rashes during his

time at Eastern do not support plaintiff's claim that his skin condition was so serious

that it required immediate, emergency treatment, or that defendant Bhavsar was

deliberately indifferent to any serious medical need.  Plaintiff's claim against Dr.

Bhavsar should be dismissed.

Plaintiff's claim that Dr. Milicevic was deliberately indifferent to plaintiff's

serious medical need with respect to his skin rash, may also be dismissed.  For the

reasons discussed above, plaintiff's skin condition did not constitute a serious medical

need.  This is further evidenced by plaintiff's lengthy appointment with Dr. Milicevic

on July 13, 2005, in which there is only a very small mention of plaintiff's skin rash.

This was plaintiff's only appointment with Dr. Milicevic.  The purpose of the

appointment was principally to address plaintiff's request for a bottom bunk pass, and

therefore the discussion focused on plaintiff's medical history of foot surgery and the

pain in his right thigh.  (Dkt. No. 46, Milicevic Dec'l, Ex. A at 11, 8).

Plaintiff had, by July 13, 2005, submitted two of his handwritten "Sick Call

Requests," and one of them complained of a skin rash and insect bites.  (Dkt. No. 46,

Milicevic Dec'l, Ex. A at 13, 12).  The only notation in the AHR of that appointment

about the skin rash is an arrow pointing to the notation "sick call re rash/bites."  (Dkt.

No. 46, Milicevic Dec'l, Ex. A at 8).  This would seem to indicate that plaintiff should

attend sick call about the rash.  In that appointment, Dr. Milicevic examined plaintiff

and made extensive notes about plaintiff's medical complaints and his medical history

with respect to other medical issues.  Dr. Milicevic determined that plaintiff's skin

condition could wait until the next sick call, indicating her judgment that plaintiff's

skin condition was not an emergency or other serious medical need.  Plaintiff's claim

that Dr. Milicevic was deliberately indifferent to plaintiff's skin condition should be

dismissed.[3]

## 4.    **Conspiracy Claim**

Plaintiff claims that Sergeant Lucas was involved in the alleged Eighth

Amendment violations relating to medical care because of an alleged telephone call by

Sergeant Lucas to Dr. Milicevic "on or about July 13, 2005."  (Compl at 4-5).

Plaintiff states that the content of the call was an instruction to Dr. Milicevic "to deny

plaintiff's request for a bottom bunk pass and exam, diagnosis and treatment of

plaintiff's persistent skin rash, because the plaintiff was a trouble maker, who

constantly filed grievances."  (Compl. at 5).  During discovery, plaintiff sought

telephone records to substantiate his claim that the alleged telephone call took place.

---

[3] The court must point out that plaintiff continued to complain about the care he received
for his skin rash even after he was transferred out of Eastern and into Five Points. *See Fox v.
Poole*, 06-CV-148, 2008 U.S. Dist. LEXIS 33833, *45-46 (W.D.N.Y. April 24, 2008)(Scott,
M.J.), *reconsideration denied*, 2008 U.S. Dist LEXIS 61886 (W.D.N.Y. Aug. 12, 2008).  The
court in the Western District held the plaintiff's skin rash was not a "serious condition" for
purposes of the medical care analysis, and in any event, plaintiff was treated for the condition,
negating the "deliberate indifference" prong of the analysis. *Id.* at *46.

(Dkt. No. 44).  Defendants argue the conspiracy claim is barred by the "Intracorporate Conspiracy Doctrine."  (Dkt. No. 46, Memo. at 7-9).

In defendants' earlier Motion to Dismiss, defendants made the same argument that intracorporate conspiracy doctrine barred the conspiracy claim.  (Dkt. No. 11, Memo. at 6-7).  In the Report-Recommendation to Senior United States District Judge Lawrence E. Kahn, this court explained why it found defendants' argument unavailing.  (Dkt. No. 21, 22-23).  Defendants objected to the Report-Recommendation, but only on the basis that plaintiff's claims were not exhausted. (Dkt. No. 22).  District Judge Kahn adopted the Report-Recommendation in its entirety.  (Dkt. No. 23).  Defendants failed to object to this court's finding that the intracorporate conspiracy doctrine did not apply in this case, and have now made the *same* argument advocating that this court apply the doctrine in defendants' Motion for Summary Judgment.  This court continues to find that the intracorporate conspiracy doctrine does not apply, however, the court will proceed to address the conspiracy issue.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) and overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted); *Taylor v. Hansen*, 731 F. Supp. 72, 78 (N.D.N.Y. 1990).

In this court's recommendation on defendants' motion to dismiss, this court found that "[t]he only conspiracy claim in this action that is not completely conclusory and can survive a motion to dismiss is the claim that defendant Lucas conspired with defendant Milicevic to violate plaintiff's Eighth Amendment rights." (Dkt. No. 21, 23). Plaintiff's claim cannot survive a motion for summary judgment. This court has found that plaintiff was not subject to an Eighth Amendment violation. Plaintiff is therefore unable to prove that he was the victim of an "***unconstitutional*** injury" committed by defendants Lucas and Milicevic. The conspiracy claim should be dismissed.

## 5.   <u>Retaliation Claim</u>

Plaintiff claims that he was transferred to Five Points "in retaliation for having filed grievances . . . along with [my] refusal to sign an extension to stay double celled beyond the agreed upon 60 days." (Compl. at 8). Plaintiff states that he was "threatened" by Sergeant Lucas "and told that I would be transferred, if I didn't sign the form agreeing to stay in a double cell beyond 60 days." (Compl. at 8). Plaintiff argues that even though he was placed in a single cell at Eastern on August 15, 2005, he was transferred to Five Points "without 'cause'. . . ." *Id*. Plaintiff argues that he was forced to remain in a double cell almost one year beyond the original sixty days at Eastern. (Dkt. No. 52, Statement of Material Facts ¶ 7).

Any action taken by a defendant in retaliation for the exercise of a

23

constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id*. (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).[4]

The court in *Dawes* stated that in order to survive **summary dismissal**, the plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Dawes*, 239 F. 3d at 492 (citations omitted).  Subsequent Second Circuit cases have

---

[4]The court would note that *Dawes* did not create a "heightened pleading standard," and to the extent that it did create such a standard, the Second Circuit held that *Dawes* was inconsistent with *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002).  *See Phelps v. Capnolas*, 308 F.3d 180, 187 (2d Cir. 2002).  The decision in *Phelps* resulted from a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and the court was considering only the face of the complaint.  This case comes before the court upon a motion for summary judgment, thus, this case is distinguishable from a situation in which only the complaint is being examined.

held that, in a prison context, all that is required is that the adverse conduct by defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights.  *See Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).  In *Gill*, the court held that this objective test applied, even where a particular plaintiff was ***not subjectively deterred*** and continued to file grievances and lawsuits.  *Id.*

In *Colon v. Coughlin* the Second Circuit acknowledged that inmates have a constitutional right to file grievances, and that prison officials may not retaliate against them for exercising that right. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). In this case, defendants concede that plaintiff's filing of grievances and his refusal to sign a waiver permitting him to remain double-celled constitute protected activities under the first element of retaliation under *Dawes*.  (Dkt. No. 46, Memo. at 10).

The court must next examine whether plaintiff was subject to some adverse action by defendant Lucas.  Defendants argue that plaintiff's transfer to Five Points was not an adverse action because "the record reflects only that plaintiff was transferred from one maximum security facility to another.  That alone, absent some other allegation, is insufficient to constitute an adverse action."  (Dkt. No. 46, Memo. at 11).  Plaintiff seems to argue that the adverse action was that his transfer resulted in his continued confinement in a double cell.  Plaintiff also states that Eastern was "a

less restrictive facility" than Five Points, and that he had a liberty interest in remaining at Eastern.[5]  (Compl. at 9).

Plaintiff does not allege that he was forced to remain double-celled for longer than sixty days in a single cell that had been converted to house two inmates.  Instead, plaintiff alleges that a constitutional violation occurred when he was transferred to an entirely double-celled facility in retaliation for filing grievances and refusing to remain double-celled at Eastern Plaintiff and defendants agree that, while at Eastern, plaintiff was subject to Directive Number 4003, titled "Double Cell Housing in Converted Single Cells."  (Dkt. No. 46, Lucas Affidavit, Ex. B).  Due to overcrowding in some facilities, some single cells may be converted in order to house two inmates at once.  (Dkt. No. 46, Lucas Affidavit, ¶ 6, Ex. B at § 1701.3).  The regulation and the directive state

---

[5] This court's prior report-recommendation discussed the due process claim and recommended dismissal. (Dkt. No. 21 at 17-18).  The district court adopted that recommendation in its entirety, thus, dismissing any due process claims.  It is well-settled that the Constitution itself does not provide an inmate the liberty interest in remaining at a particular facility, regardless of the security level of the facility from which, or to which he is transferred. *See Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005)(citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976).  In *Sandin v. Connor*, 515 U.S. 472 (1995), the Supreme Court held that a due process interest could be created if the restraint on the inmate's liberty imposed an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Id.* at 483-84.  In *Wilkinson*, the court relied on the *Sandin* analysis to conclude the plaintiff had a liberty interest in his transfer to a "Supermax" facility based upon the extent and the duration of the restrictions that would be imposed on the inmate. 545 U.S. at 223-24.  The issue before this court, however, is not whether plaintiff had a procedural due process right to a particular type of hearing prior to his transfer to Five Points, the issue is whether defendant Lucas was retaliating against plaintiff for filing grievances.  Whether plaintiff was subject to an adverse action is separate from whether plaintiff had a liberty interest in remaining in a particular facility.

> No inmate shall be confined in a double-cell for a period of time more
> than sixty (60) days unless such inmate volunteers to remain in the
> double-cell for a longer period of time.  At the expiration of the 60 days,
> if an inmate does not volunteer to remain in a double-cell, the inmate
> shall be moved to a single cell *or multiple occupancy housing* at either
> his current facility or a new facility.

(Dkt. No. 46, Lucas Affidavit, Ex. B at § 1701.7(d)).  The court notes that the housing

at Five Points consists *only* of double cells. (DOCS Directive 24 at Dkt. No. 52,

Affidavit, Ex. D-5).

Plaintiff relies on a form titled "Eastern Correctional Facility Double Cell 60

Day Option" to show that his transfer should have been to a facility where plaintiff

would be housed in a single cell.  (Dkt. No. 52, Statement of Facts, ¶ 5).  Plaintiff

signed the form after choosing the third option:

> I do not agree to remain in a double cell at Eastern Correctional Facility
> beyond 60 days.  I understand that I will be submitted for transfer to any
> facility that can accommodate me *in a single cell*.

(Dkt. No. 46, Lucas Affidavit, Ex. E).

The regulation in question in this case clearly states that when an inmate refuses

to consent to remaining double-celled beyond sixty days, the inmate "shall be moved

to a single cell *or multiple occupancy housing* at either his current facility or a new

facility."  (Dkt. No. 46, Lucas Affidavit, Ex. B at § 1701.7(d)).  The regulation is very

clear that an inmate could be transferred to a facility where the inmate would continue

to be double-celled.[6]

The regulation is designed to prevent the extended housing of inmates in single cells that were converted to house two inmates.  The regulation was not designed to prevent the extended housing of inmates in double cells generally.  Though the form that plaintiff signed was not entirely consistent with the regulation and directive, the regulation and directive are clear.  Plaintiff's transfer, and the subsequent condition of his housing are fully in line with the dictates of the directive and regulations.  Therefore, the court finds no adverse action in the circumstances surrounding plaintiff's transfer to Five Points.  Both facilities are maximum security.

The court notes that when Sergeant Lucas explained to plaintiff that he would be transferred if he did not consent to remaining double-celled, Sergeant Lucas was not making a threat, but rather, informing plaintiff about the possibilities under the regulation.  Defendant Lucas also argues that he was not responsible for the timing or the location of plaintiff's transfer.

Under the signature line for the third option, the form signed by plaintiff states:

cc: To assigned Correction Counselor if inmate selects Option #3.
Counselor to submit unscheduled transfer ***immediately*** on notification.

(Dkt. No. 46, Lucas Affidavit, Ex. E) (emphasis added).  Once plaintiff signed the form, "the form was transmitted to ***plaintiff's corrections counselor*** for submission of

---

[6] Double-celling in itself is not unconstitutional. *See Jarecke v. Hensley*, 552 F. Supp. 2d 261, 265 (D. Conn. 2008).

a transfer request." (Dkt. No. 46, Lucas Affidavit, ¶ 15).  It appears that Sergeant

Lucas did **not** make the request for a transfer.  Furthermore, Sergeant Lucas was not in

a position to determine where plaintiff would be housed after his transfer from

Eastern.  *Id*.  DOCS's Office of Classification and Movement makes the determination

of where an inmate will be transferred.  *Id*.  Sergeant Lucas states that he did not take

any action in plaintiff's transfer. *Id.* ¶¶ 15-16.

In order to hold an individual liable for damages in a section 1983 action,

plaintiff must allege that the individual was "personally involved" in the constitutional

violation of which he complains. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006);

*Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).  Defendant Lucas has stated that

he had no involvement in timing or location of plaintiff's transfer.  All the evidence is

consistent with defendant Lucas's statement.  Plaintiff has not shown that there is a

genuine issue of material fact regarding who is responsible for inmate transfers after

the inmate requests to be transferred to another facility pursuant to the regulation

applicable in plaintiff's case.

Because the court did not find that plaintiff was subject to an adverse action

under *Dawes*, **and** that defendant Lucas was not involved in the transfer, the court

need not address whether or not a causal connection exists between plaintiff's

protected action(s) and the alleged adverse action.  Thus, the retaliation claim against

Sergeant Lucas should be dismissed.

**6.      Plaintiff's Request for Sanctions**

Plaintiff is incorrect when he states that defendants failed to comply with this court's May 6, 2008 order (Dkt. No. 48) regarding the production of telephone records.  Defendants requested and were granted an extension of time to comply. (Dkt. Nos. 49 & 50).  Though plaintiff apparently did not receive the telephone records before he filed his cross-motion, they were timely served on him by mail. (Dkt. No. 53, Declaration Exhibits).  The motion for sanctions should be dismissed.

Plaintiff's complaint that the telephone records did not supply him with any information regarding what departments or individuals are assigned to what extensions is *moot* in light this court's recommendation that defendants' motion for summary judgment be granted.

**WHEREFORE** it is hereby

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 46) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's cross-motion for summary judgment and motion for sanctions (Dkt. No. 52) be **DENIED**.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of*

*Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed.

R. Civ. P. 6(a), 6(e), 72.

Date: March 9, 2009

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

31